150        152
206        ¹426

150        152
e 25 SC ³274

150        152
29 SC 185

150        152
34 SC ¹225
34 SC ⁴229

## Westfield Borough *v.* Tioga Co., Appellant.

## Everett et al., Councilmen, *v.* Bailey et al., Co. Com.

*Highways—Bridges—Approaches—Liability of Tioga county.*

Where a bridge has been entered of record as a county bridge and built by the county, the expense of building the approaches must also be borne by the county. The local laws of Tioga county do not exempt it from such liability.

*Tioga County Act of March 24, 1851, construed.*

It seems that the Act of March 24, 1851, P. L. 245, providing that " it shall be the duty of road commissioners of those townships in which a county bridge is or hereafter may be located in the county of Tioga, and they are hereby required to do, or cause to be done, all embankments and repairing necessary to make said bridge or bridges accessible to public travel and preserve the abutments thereof, and cause the expense of the same to be paid out of the road fund of said township," does not apply to the original construction of a bridge, but to subsequent repairs. The word "located," it seems, means built and not merely given a location.

*Repeal of statutes—General and local.*

It seems that the Act of April 14, 1855, P. L. 240, entitled an Act to consolidate and amend the road laws of Tioga and other counties, providing that such counties shall thereafter be subject to the general road laws of the commonwealth except so far as they are altered and supplied by the provisions of that Act, with a repealing clause as to the general road laws of the commonwealth and " of all other laws as are altered or supplied by this Act, so far as they relate to said counties, " repeals the Act of 1851 above, and reinstates the general road law of 1836, and its supplements, in force when it was approved, except so far as they are altered and supplied by its own express provisions.

*Repeal of statutes—Bridges Acts, 1879, 1887.*

It seems that the Act of June 11, 1879, P. L. 147, as amended by the Act of May 25, 1887, providing that whenever the county commissioners do not deem it advisable to enter such bridge on record as a county bridge, but shall consider it proper to assist such township in building the same, they shall have power either to build such bridge or any portion thereof, or to furnish the money, with general repealing clause, repeals local laws establishing a different rule.

*Statutory direction under Act of March 10, 1806.*

It seems that the Act of March 10, 1806, providing that in all cases where a remedy is provided or duty enjoined or anything directed to be done by Act of Assembly, the directions of the Act shall be strictly pursued, applies to this case.

Argued May 3, 1892.    Appeal, No. 298, Jan. T., 1892, by

defendant, from decree of C. P. Tioga Co., Jan. T., 1892, No. 16, for plaintiffs, in petition for an alternative mandamus, against defendants to compel completion of approaches to county bridge. Before PAXSON, C. J., STERRETT, GREEN, McCOLLUM and MITCHELL, JJ.

The facts appear from the following opinion of the court below, by MITCHELL, P. J.:

" This case is submitted on petition, answer and replication. No question of fact is in dispute. The question presented by the pleadings is whether it is the duty of the defendants to build the approaches to a county bridge, the location of which is lawfully fixed in the borough of Westfield. The superstructure of the bridge has been erected by the county, and the bridge has remained thus incomplete, without any approaches to make it useful to the public, for some months past. The plaintiffs claim that the duty in question rests upon the county under the general road laws; the defendants assert that it is imposed upon the borough by the local Act of 1851, P. L. 245. The plaintiffs reply that that Act does not relate to the original approaches, and that, if it does, it is not in force, insisting that it was repealed by the local Act of 1855, P. L. 240; and suspended, in a case like this, wherein the bridge in question is entered of record entirely as a county bridge, by the operation of the general Acts of 1879, P. L. 146, and 1887, P. L. 267.

" A public bridge is a structure which affords a safe, convenient and complete passage-way over some obstacle that, without it, would prevent, hinder or delay the free transit of those who desire to pass along a public highway. See 2 A. & E. Ency. L., 540, *et seq.;* and Law Dictionary, title, 'Bridge.' At common law such a structure is part of the public highway which it thus serves to mend and make more convenient and serviceable to the public: Rex v. Sainthill, 2 Ld. Raym. 1174. And such is the law in this state and generally in this country: Rapho Twp. v. Moore, 68 Pa. 404; Penn Twp. v. Perry Co., 78 Pa. 457; Comrs. v. Bridge Co., 12 Cush. 243; Washer v. Bullit Co., 110 U. S. 564.

" It follows that those charged with the duty of making and maintaining public roads should erect and maintain, so far as the means within their power enable them to do so, whatever

bridges are necessary to make such highways reasonably con-
venient and useful to the public, unless they be discharged from
the duty by statutory change of the common law : Erie Co. v.
Com., 127 Pa. 206.

" The duty of making and maintaining public highways in
Pennsylvania was cast upon our local municipalities at an early
day, by statute, and was then more definitely defined than by
the common law.   But it often happened that bridges, though
necessary for convenience of the public at large, were too ex-
pensive and burdensome upon these minor municipalities,
wherefore the Legislature has, from time to time, intervened
and provided methods for transferring this duty and imposing
it upon others more able to perform it.   Thus we have the act
of 1836 and its supplements providing for the construction of
county bridges or parts of the more expensive public bridges
by the respective counties.   But unless such lawful proceed-
ings be had thus to charge this duty wholly or in part upon
the county it still rests upon the local municipality.   And al-
though the general road laws do not expressly mention boroughs,
it results from the views we have expressed that they are sub-
ject to the same duty in this respect as townships, and we think
these laws should be so construed.   Road in Milton, 40 Pa.
300.

" Under the general law undoubtedly the duty in question
here rests upon the county.   The approaches are a necessary
part of the bridge, and if the general law is here in force the
county must build them: Penn Twp. supra; Com. v. Loomis,
128 Pa. 174.   ' The same rule is held in other states, and is
that of the common law.'   A. and E. Ency. of Law, 557, cit-
ing many cases.   See also Wharton's and Anderson's L. D.,
title, Bridge.

" Let us see whether the Act of 1851 establishes a different
rule in this county.   That Act provides as follows: ' Sec. 2.
That from and after the passage of this act it shall be the duty
of the road commissioners of those townships in which a county
bridge is or hereafter may be located in the county of Tioga,
and they are hereby required to do, or cause to be done, all
embankments and repairing necessary to make said bridge or
bridges accessible to public travel, and preserve the abutments
thereof, and cause the expense of the same to be paid out of

the road fund of said township.' This Act was extended to supervisors the following year. That portion of the title referring to the section reads ' relative to county bridges in the county of Tioga.'

" The meaning of this section is doubtful or obscure, owing to the inapt use of words and the uncertain relation of clauses apparent in it. In such a case the received use of words, having regard to the subject-matter and effects and consequences, may be departed from to make plain the legislative intent: 1 Bl. Com. 60.

" The first obscurity we notice lies in the use of the word ' located.' The location for a county bridge may be said to be fixed when it is duly approved and entered of record as such to be erected by the county at the place selected for it by the view appointed for that purpose. But the bridge itself cannot be properly held to be located until it is in fact erected at the place fixed for its location. If the word ' located ' be held to mean merely the fixing of the place of location, the intent of the section would seem to be that the supervisors should proceed to do whatever it requires them to do as soon as the bridge is duly entered of record as a county bridge. But this would be to give an unreasonable effect to it, if they must construct its approaches, because this cannot practicably and completely be done until the abutments are in place so that the extent and dimensions of the approaches and embankments can be ascertained. Hence we conclude that this word was not used in this restricted sense, but in its primary and ordinary meaning derived from its root in the participial form, *locatus*—implying ' placed, situated, fixed in place.' See Webster's Dictionary.

" The word is used in the participial form here, in connection with its auxiliary to put it in the passive voice. Therefore it signifies that the bridge itself is to be acted upon before it can be said to be located, and its signification is equivalent to that of the word built. It must necessarily be thus construed so that it may include, as the section does expressly include, bridges existing when the Act was passed. The expression is ' bridge is or hereafter may be located.' Surely as to the bridges then existing, the meaning is ' situated,' ' built in its fixed location ; ' as we say ' The county farm is located in Charleston township,' ' that bridge is located in the borough

of Westfield,' and we think this meaning clearly shows the legislative intent as to all county bridges located in this county, whether built before or after the passage of this Act.

" Whatever construction is the proper one, the evident object and intent of the section were to impose additional burdens upon our local municipalities, and, in view of this effect upon them, it should be so strictly construed as not to place upon them any additional obligations not clearly defined or manifestly intended to be charged upon them. This is a well settled rule of construction. To arrive at a proper conclusion in this respect we must endeavor to discover what is meant by the expression 'bridge is or hereafter may be located,' in connection with the words 'do or cause to be done all embankments and repairing necessary to make said bridge or bridges accessible to public travel and preserve the abutments thereof.' If possible, they should be so construed as to give reasonable effect to the whole section. The use of the words, 'do or cause to be done,' indicates, as we think very plainly, the real purpose of this enactment. They are aptly employed in connection with the words 'all repairing necessary to make said bridge or bridges accessible to public travel and preserve the abutments thereof,' but are very inartificially employed in connection with the word 'embankments.' To give them effect in respect to embankments they must be held equivalent to the expression 'made or caused to be made,' and their derivation would justify such a construction. But they clearly indicate, we think, that the word 'embankments' was an after-thought put in by an amendment to the bill as originally drawn. Leaving out that word the section would be expressly limited to repairs, and it could not be properly construed to relate to the original approaches, further than to provide for repairing them. But it might well happen that mere repairing would not meet the exigencies of all cases that may have arisen before the Act passed, or of those that might thereafter occur. In some of them there may have been or might be a necessity for building embankments originally, or to renew old ones necessary to protect bridges or make them accessible as parts of highways. The year before this Act was passed an unprecedented flood had visited this county, and it is within the recollection of many of us hereabouts that it swept away some, and greatly

endangered others of our county bridges, rendering some of them unfit for public travel. We have no doubt that this was the moving cause of this enactment. We do not think it was intended to change the general law in respect to building county bridges. It was intended to meet just such emergencies as had then arisen, in order that the local authorities should be vigilant and active, in measures to be taken by them in such cases, to preserve and to keep useful to the public these costly structures. The county commissioners, often residing distant from many of those bridges, could not so promptly and efficiently attend to these duties.

"But we must deal with the Act as we find it written, and adopt an interpretation consistent with it as it stands. What, then, is the meaning of the clauses we have quoted, taken as we find them in the Act itself? The definition of a bridge, as we have given it and as the Supreme Court defined it, includes the approaches necessary to make it 'accessible to public travel.' Therefore until thus completed there is no bridge. Hence, construing the word 'located' either in its literal or its popular sense and the word 'bridge' according to its adjudicated interpretation, a county bridge is not located until so completed and made 'accessible to public travel.' But it may, after such completion, become inaccessible to travelers and therefore useless to the public. Such a case would give full effect to this statute as we construe it. And this construction is entirely consistent with the general law on this subject as construed by the Supreme Court and in force in this county when this Act was passed, so far as it relates to the duty of making approaches to county bridges. True it is, we think, that the law was not then generally understood or enforced as it was first construed by the Supreme Court in the Perry county case in 1875. Indeed we think the approaches to county bridges in this county have never been made by the county. They have uniformly been constructed by the local municipalities from an early day, so far as we have been able to ascertain, and certainly had been prior to the Act of 1851. Therefore there does not appear to have been any necessity for that Act to compel our local authorities to make these original approaches. But from the reading of the Act itself we are of opinion that the word 'embankments' was not intended to include

original approaches, yet it has reference either to the words 'to make said bridge or bridges accessible to public travel' or to the subsequent expression 'and preserve the abutments thereof,' or to both of the provisions. It may properly be held applicable to both and yet not applicable to original approaches. Such a construction gives reasonable effect to all the words of obscure meaning in the section.

"If at that time any bridge were so out of repair that any embankment was necessary to make it accessible to public travel, such a case would have given full effect to that word in connection with the former clause; and if an abutment of any bridge were then so exposed to injury by flood or otherwise that an embankment was needful for its preservation, such a case would have given full effect to that word in connection with the latter clause. And we have seen by reference to our local history that such cases had then recently arisen. This construction would not only account for the provision made for then existing bridges, but such existing emergencies would have afforded reason also for making the Act applicable to cases subsequently arising. We are of opinion that the Act of 1851 had originally no application to such a case as is here presented, and therefore conclude that the duty here in question was not imposed by it upon the plaintiffs.

"In this conclusion we may be in error, and we proceed to examine the allegation in plaintiff's replication that the Act of 1851 was repealed by the local Act of 1855, P. L. 240. That Act is entitled, 'An Act to consolidate and amend the road laws of Tioga, Potter, McKean and Elk counties.' When passed, these counties composed the fourth judicial district. The purpose of this Act is clearly expressed in its title. It was to consolidate and amend not only the road laws of this county, but those of all the counties named, and, by such consolidation and amendment, to establish in all of them a uniform system of law on the subject. One of the laws thus to be consolidated or amended, together with all others on the same subject then in force in those counties, was the Act of 1851 here in question. If not itself bodily, or in an amended form, included in the Act of 1855, it has no place in the new system of law established by the latter Act. The method adopted to establish this new system is developed in the first section of the later Act, which

lays the foundation upon the general road laws of the commonwealth. That section provides: 'That the counties of Tioga, Potter, McKean and Elk shall hereafter be subject to the general road laws of this commonwealth except so far as they are altered and supplied by the *provisions* of this Act.' The subsequent sections make sundry 'provisions' not relevant to the question before us, and provide for the appointment of road and bridge viewers, regulate their proceedings and define the duty and power of the court in respect to them, and provide for the ascertainment of damages and how they may be apportioned, paid, etc. The last section contains a repealing clause as follows: ' That so much of the general road laws of this commonwealth and of *all other laws* as are altered or supplied *by this act,* so far as they relate to the said counties, are hereby repealed.' This Act contains no provision altering or supplying those of the general road laws in respect to building county bridges or the approaches to them. But it says most explicitly that the county of Tioga shall be subject to the general road laws not altered or supplied by it. Therefore even if the Act of 1851 imposed the duty here in question upon the local municipalities, that of 1855 reinstates the general road laws on the subject in this county, and thus establishes an entirely different and antagonistic rule in relation thereto. Where there is such an irreconcilable conflict between two general laws upon the same subject that they cannot be harmonized with each other and thus be made to stand together and both be concurrently enforced, the latter necessarily implies the intended repeal of the earlier one without any express negation of it: Bank v. Com., 10 Pa. 448; Egypt Street, 2 Grant, 455. But when the conflict is between a local and a general law the rule of construction is different, and generally the former will not be held repealed by the latter, unless there be some clear expression of a negative intent: Brown v. Comrs., 21 Pa. 42; Dyer v. Covington, 28 Pa. 186; Bounty Accounts, 70 Pa. 92; Morrison v. Fayette Co., 127 Pa. 110; Malloy v. Com., 115 Pa. 25; Homer v. Com., 106 Pa. 226; Harrisburg v. Sheck, 104 Pa. 53. Still, there are instances of implied repeals of local Acts without such express negation: Nusser v. Com., 25 Pa. 126. And a subsequent affirmative statute implies a repeal of a former one concerning the same subject matter if it introduce

a new rule upon that subject and be plainly intended as a substitute for the former, although it contains no express words repealing it: Johnson's Estate, 33 Pa. 511. And where all the essential provisions of a local Act are supplied by a later one, the same rule applies: Cont. Election Case, 110 Pa. 502. Even when two Acts are not in express terms repugnant, yet if the later one covers the whole subject of the first and embraces new provisions plainly showing that it was intended as a substitute for it, the later operates a repeal of the earlier Act: U. S. v. Tynen, 11 Wallace, 92. But if they can stand together, an implication of repeal does not arise: Henderson's Tobacco, 11 Wallace, 657.

"It follows necessarily, as we think, from the nature and characteristics of these two Acts and from the express repeal of all former Acts so far as they are altered and supplied by the later ones, that the Act of 1851, construed as the defendants insist upon it, cannot stand against that of 1855. In stating this conclusion we construe the expression 'the general road laws of this commonwealth' as inclusive of the subject matter of the Act of 1851. The Act of 1855 itself evidently intends such a construction, for its title speaks only of road laws, while it embraces provisions in relation to county bridges. The title of both Acts are covered by that of the general Act of 1836, 'An Act relating to roads, highways and bridges.' Bridges are but parts of highways. Go where we may through the wide domain of laws relating to roads and bridges, in statutes, digests, and in judicial discussions, we find the Act of 1836 and its supplements spoken of as 'the general road laws.' Judges of our Supreme Court have constantly thus employed this expression in their opinions. See 4 S. & R. 107; 8 Pa. 91 and 92; 8 Watts, 175; 4 Pa. 303; 32 Pa. 383; 38 Pa. 462; 23 Pa. 287; 40 Pa. 301; 42 Pa. 283.

"Therefore, we think this expression in the Act of 1855 includes the provisions of the Act of 1836 and its supplements then in force in relation to county bridges. Clearly we think the Act of 1851 was itself a road law in contemplation of the Legislature when it undertook to consolidate and amend the road laws of the counties named in the Act of 1855, yet it was then in force in but one of these counties. If it be still in force and to be construed as the defendants contend, notwithstand-

ing its entire repugnance to the general road laws on this subject, because it is not expressly named or specifically negatived in or by the Act of 1855, then every local road law then in force in any one of those counties may still be in full vigor. And this would most effectually defeat the very object and intent so clearly expressed in the Act of 1855.

" In effect the Act of 1855 reinstates the general road law of 1836 and its supplements, in force when it was approved, except so far as they are altered and supplied by its own express provisions. Therefore it alters and supplies and expressly repeals all Acts and parts of Acts, whether local or general, so far, and only so far, as they are inconsistent with the general road laws, or with its own express provisions excepted out of those general laws. These exceptional provisions make no reference to the subject matter here in dispute. If the repealing clause has followed the expression in the first section and repealed only all laws altered and supplied by the ' provisions' of the Act, possibly its intent would have been more obscure; for then it might have been urged that it would be applicable only to the exceptional provisions expressly made to change the general law. But the expression in the repealing clause is ' by this Act.' Wherefore the logical effect, so far as the question before us is concerned, is the same as if the Act had simply re-established the general road law and repealed all laws altered and supplied by it. Surely, the Act of 1851 construed as contended for by the defendants, is altered and supplied by the provisions of the general road laws on this subject, which were put or kept in force here by the Act of 1855, and is therefore repealed expressly by the latter Act. Even without such an express repeal, we are of the opinion, supported by the cases we have cited, that the latter is so manifestly intended to establish a complete system in the counties named, which is so entirely inconsistent with that contended for by the defendants, that it necessarily supersedes the former.

" It is also urged on the part of the plaintiffs that a like effect results from the general Act of 1879, P. L. 146, and its supplement of 1887, P. L. 267. The effect of that legislation is to empower the county commissioners to aid local communities in building county bridges as they think proper, without adopting any bridge in question wholly as a. county bridge. And the

supplement repeals all Acts or parts of Acts inconsistent with this legislation.

" In this case the county commissioners took upon the county the entire responsibility of building the bridge in question. Having elected to do this, under these Acts which expressly authorize them to limit the liability of the county to the construction of any part or parts of the bridge as they might have thought proper, we think they should be held to the complete discharge of the duty thus assumed for the county. They accepted this as a county bridge under a definition of the law by the Supreme Court that makes the original approaches part of it. They undertook to make a bridge, and have stopped with the erection of the abutments and superstructure, leaving them standing useless to the people whose money they used for this purpose, insisting that the obligation they took upon the county is fully discharged. In such a case we think it not unreasonable to hold that any local law that may have established a different rule is superseded by such an election, especially in view of the repealing clause in the Act of 1887.

" And, although we find no case in point, we think this conclusion is strengthened by the Act of March 10, 1806, § 13, Purdon, 1883, page 74, pl. 5. This section is as follows : ' In all cases where a remedy is provided, or duty enjoined, or anything directed to be done by an Act or Acts of Assembly of this commonwealth the directions of the said Acts shall be strictly pursued.'

" When this bridge was duly reported by the view, recommended as a county bridge by a grand jury and this report and return concurred in by the court, it was the duty of the county commissioners to consider and to decide whether it should be recorded as a county bridge and entirely erected from the county stock, or whether they should refuse thus to accept the entire responsibility for its construction ; and in case of such refusal, whether they would aid, and if so to what extent, in its construction by the burgess and council of Westfield. These duties are expressly enjoined upon them and plainly directed to be done by Acts of Assembly which, under the Act of 1806, must be strictly pursued.

" In this view surely there is no hardship for the county. The commissioners may aid the local municipalities to what-

ever extent they think proper, or they may decline to accept for the county any responsibility whatever. In this case the predecessors in office of these defendant commissioners accepted the entire responsibility, and it is the duty of the defendants to discharge that obligation completely by constructing whatever original approaches are necessary to make the bridge conveniently accessible to public travel.

" We have arrived at this conclusion with some reluctance, after the most careful and thorough consideration, because it does not accord with the contemporaneous construction which appears to have been placed upon the local statutes we have considered, by the official agents of the townships and boroughs in which county bridges have been erected. Such customary usage is entitled to great weight: Com. v. Cornish, 1 Harris, 291; U. S. v. Pugh, 99 U. S. 269. But we are not aware that this practice is based upon any judicial determination. Indeed, we think, as we have said, that it was in vogue before the Act of 1851 in this county. And we suppose it has continued since the Perry county case was decided, because we had local road laws that might seem to justify it; and the effect of the general Acts of 1879 and 1887 has not apparently been before this drawn into question. In view of these later Acts the question under consideration is of very little importance, but we understand from the county solicitor that the defendants desire that it be determined by the Supreme Court. In consideration of this, and of the impracticability of the work to be done at this season of the year, we deem it proper to postpone the operation of the writ to a more convenient season.

["And now, to wit, Jan. 11, 1892, it is ordered that judgment be entered for the relators, and that the respondents, commissioners of the county of Tioga, be and they are hereby commanded, on or before the first day of June next, to make and complete good and sufficient causeways and approaches to and into the county bridge situate in the borough of Westfield in said county, over the Cowanesque river, where River street crosses the same, in a good and workmanlike manner, so that the said bridge shall be and become conveniently accessible and useful to the traveling public, and in all respects to complete said bridge to that effect; and that they cause the expense thereof and the costs in this case to be paid out of the treasury of said county." [1]

*Error assigned* was entry of judgment, quoting decree as above.

*Jerome B. Niles,* with him *Aaron R. Niles* and *Alfred J. Niles,* for appellants, cited, *inter alia,* the local Acts of April 13, 1843, P. L. 221; April 5, 1844, P. L. 200; March 30, 1846, P. L. 203; April 5, 1852, P. L. 253; April 2, 1860, P. L. 553; Jan. 11, 1861, P. L. 5; and an unreported decision of the Supreme Court affirming a decision of the common pleas of Tioga county, holding that the Act of June 1, 1883, P. L. 54, providing for the election of one third of six councilmen in boroughs not now enjoying this right by special statute, did not repeal the local Act of Jan. 23, 1873, P. L. 98, providing for the annual election of one half of the councilmen in Wellsboro, the case arising at the first election for borough offices after the passage of the Act of 1883.

*D. W. Baldwin,* for appellee.

PER CURIAM, July 13, 1892.

This case has been so thoroughly discussed by the learned judge below, that nothing further remains to be said. We affirm the judgment for the reasons given by him in his opinion.

Judgment affirmed.